John Vaccaro v. Commissioner. John S. Waterman, Jr. v. Commissioner. Cora Sextro Waterman v. Commissioner.
Vaccaro v. Commissioner
Docket Nos. 111858, 111859, 112537.
United States Tax Court
1943 Tax Ct. Memo LEXIS 102; 2 T.C.M. (CCH) 820; T.C.M. (RIA) 43433; September 23, 1943
*102 Robert A. Ainsworth, Jr., Esq., 2208 American Bank Bldg., New Orleans, La., for the petitioners. Homer J. Fisher, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion KERN, Judge: Respondent determined deficiencies in the income tax of petitioners for the year 1939, as follows: John Vaccaro
$3,417.93
John S. Waterman, Jr.
273.37
Cora Sextro Waterman
273.37
By amended answer respondent now alleges that the correct amount of the foregoing deficiencies should be as follows: John Vaccaro
$4,562.76
John S. Waterman, Jr
374.83
Cora Sextro Waterman
374.83
The parties in the case of John Vaccaro v. Commissioner of Internal Revenue, Docket No. 111858, have filed a complete Stipulation of Fact. The parties in the cases of John S. Waterman, Jr. v. Commissioner of Internal Revenue, Docket No. 111859, and Cora Sextro Waterman v. Commissioner of Internal Revenue, Docket No. 112537, have filed stipulations to the effect that an issue common to all three cases be determined by our holding in the case of John Vaccaro v. Commissioner of Internal Revenue. Other issues in the two Waterman cases having been waived, the three cases are, *103 upon our own motion, consolidated for the purpose of this opinion. [The Facts] We find the facts to be as stipulated and incorporate the stipulation herein by reference. The following short statement of facts indicates the problems presented in these proceedings: Petitioner, John Vaccaro, on March 8, 1939, became the lessee of a mineral lease granted by the Acosta heirs and one James J. Tracy on a tract of land in Lafourche Parish, Louisiana, measuring 1 1/2 arpents by 40 arpents, referred to as the Acosta tract or strip. In October 1938 petitioner, John Vaccaro, organized a joint venture, known as the Vaccaro-Acosta Lease Joint Venture, which acquired the beneficial interest in this lease. By April 12, 1939, the total cost of the Joint Venture's interest in this leasehold totaled $138,600.24. The Acosta tract on April 12, 1939, contained one oil well completed as a producer and one well almost completed. Petitioners, John S. Waterman, Jr., and Cora Sextro Waterman, as a community, owned an interest in the joint venture. As early as 1936 oil development had been begun by the Barnsdall Oil Company on the Heloise and Celina Plantations in Lafourche Parish, Louisiana, under *104 its mineral lease known as the Harang Lease. Pan-American Production Company became a half owner of the Harang Lease on March 27, 1937, and by April 12, 1939, there had been completed on the Heloise Plantation (outside of the Acosta strip) nine producing oil wells and two dry holes. The two corporations above mentioned will be referred to herein as Barnsdall and Pan-American. The Heloise Plantation is described as a tract of land in Lafourche Parish, La., measuring 10 arpents, more or less, by 40 arpents, more or less. The Acosta strip lay within this plantation, and because of a dispute between the Acosta heirs and the grantors of the Harang Lease as to title to this strip, Pan-American and Barnsdall drilled none of their wells thereon. By April 12, 1939, the Supreme Court of Louisiana had rendered a decision in favor of some of the Acosta heirs as to their title to the Acosta strip. Similar litigation involving the same parties was still pending in the United States District Court for the Eastern District of Louisiana. On April 12, 1939, a contract and agreement was executed which provided, among other things, that the interests of various parties in the Acosta tract, including *105 the interest of John Vaccaro (acting on behalf of the Joint Venture), were relinquished, abandoned, and surrendered to Barnsdall and Pan-American, and the Vacarro-Acosta Lease was thereby agreed to be null, void, and of no effect. The Haranglease was confirmed by all parties in interest and it was agreed that the Acosta Tract was thereafter to be considered as part and parcel of the lands covered by the Harang Lease. In consideration for this surrender of its interest in the Acosta tract the Joint Venture received in the name of John Vaccaro the following: Cash
$163,000
Contingent oil payment
$100,000.00
Less: Commission, contin-
gent oil (L. G. Welsch)
7,500.00
Net contingent oil payment
$ 92,500.00
The cost to the owners of the Vacarro-Acosta Lease Joint Venture of the interest disposed of by said contract, was as follows: Bayou Interests, Inc
$ 55,000.00
Cost of well
61,568.41
Rig rental
2,300.00
Legal expense
12,131.83
Cash commission (to L. G. Welsch)
7,500.00
$138,600.24 The contingent oil payment was payable from 1/8 of the oil thereafter "produced under the Harang Lease from the lands embraced in the Heloise Plantation (of which the Acosta *106 Tract forms a part)." The net contingent oil payment of $92,500 had a fair market value on April 12, 1939 of $69,375. The total cash collected by the Vaccaro-Acosta Lease Joint Venture in 1939 upon the contingent oil payment of $92,500 was $40,107.59. The remainder of said oil payment in the amount of $52,392.41 was collected by the Vaccaro-Acosta Lease Joint Venture in the year 1940. Petitioner, John Vaccaro, kept his books upon the cash basis. His distributive share of the income of the Joint Venture for 1939 was 30/128ths. The transaction of April 12, 1939 gives rise to the gain, the computation of which is in dispute in this proceeding. [Opinion] The crucial question for our decision has to do with the correct treatment for tax purposes of the contingent oil payment received by the members of the joint venture as partial consideration for the release and quit-claiming by them of their rights under a mineral lease covering a small strip of land running across a larger tract. In return for this release they were given $163,000 in cash together with an oil payment in the net sum of $92,500, payable from oil to be produced from the larger tract. The respondent contends that *107 this trans action should be considered as an exchange of property for cash and different property, and that the amount realized by petitioner should be considered as being "the sum of money received plus the fair market value of the property (other than money) received", pursuant to section 111 (b), Internal Revenue Code, from which should be subtracted the cost basis of the joint venture in and to the lease surrendered, in determining taxable gain under section 111 (a). Petitioners' argument seems to be that so far as the oil payment received by the joint venture was concerned, it is improper to add its fair market value to the amount of cash received since its "value had not actually been realized in the year involved," but was "fictitious or imagined", and therefore it should not be considered in determining gain resulting from the transaction in question; and that only the actual receipts from the oil payment during the taxable year, less percentage depletion, should be taken into income by the members of the joint venture. We have found as a fact that the net oil payment of $92,500 had a fair market value on April 12, 1939 of $69,375. This we have done by reason of the following *108 paragraph of the stipulation: An engineer revenue agent representing respondent and duly qualified as an expert in the valuation of oil properties, if called to the witness stand and sworn, would testify, over objection of the petitioner that his testimony was legally irrelevant to the issues in this case, that the net contingent oil payment of $92,500 received by the Vaccaro-Acosta Lease Joint Venture under the contract, had a fair market value on April 12, 1939, of $69,375. The case of Robert J. Boudreau, 45 B.T.A. 390, affirmed 134 Fed. (2d) 360, not only disposes of the objection to the testimony referred to in the quoted paragraph of the stipulation, but also is determinative of the entire case. The oil payment in question is subject to valuation; the fair market value determined by respondent is presumed to be correct; and this determination of fair market value is substantiated by expert testimony and the facts in the case which show the collection in full of the oil payment within two years. Therefore the fair market value of the property interest represented by the oil payment contract should be added to the cash *109 received by the joint venture in determining gain under section 111. The remaining question has to do with the proper depletion to be calculated upon the receipts of the joint venture from the oil payment during the taxable year. It is stipulated that these receipts were in the amount of $40,107.59. Since we have found the fair market value of the oil payment was $69,375, and this amount is to be used in calculating the gain to the joint venture arising from the transaction discussed above, the resulting basis of the oil payment of $92,500 in the hands of the joint venture for the purpose of calculating cost depletion is the sum of $69,375. Dividing the latter sum by the amount to be ultimately realized by the joint venture from the oil payment ($92,500) we find that the amount of depletion for each dollar realized from the oil payment is $.75. Therefore, the depletion to be allowed upon the sum of $40,107.59, received by the joint venture during the taxable year pursuant to the oil payment in question is the sum of $30,080.69. The difference between these amounts, or $10,026.90, is net income of the joint venture during the taxable year. Decision will be entered under Rule 50. *110